[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a marriage of almost 31 years. The parties intermarried on October 24, 1964 at Jewett City, Connecticut. The court will find that the plaintiff has resided continuously in this state for at least one year next preceding the date of the filing of the complaint. The court will further find that there are currently no minor children issue of the marriage and will further find that the marriage of the parties has broken down irretrievably.
Before dissolving the marriage the court would like to give a short history of the marriage and its observations on the CT Page 9566 problems that arose during the course of the marriage. At the present time the plaintiff wife is 56 years of age and the defendant husband is 67 years of age. The parties currently own the marital home at 4 Atwood Road in Woodbury. There was no appraisal made at the time of the hearing on the dissolution. However, both parties had listed the property with an approximate value of $100,000 until the date of the hearing, at which time the plaintiff suddenly increased the value to $150,000. Since $100,000 was the value listed in prior financial affidavits filed with the court, the court is inclined to remain with the $100,000 value on the property. There is a mortgage in an approximate amount of $11,000 so that the parties have an equity in the home of about $89,000, or since the property is in joint names, a value of $44,500 each.
The defendant has both undergraduate and graduate degrees in music and throughout most of the marriage the defendant was employed as a professor teaching music at Western Connecticut State University. For the most part, his income was sufficient to take care of the basic household needs for the family, including the two children issue of the marriage who have since attained their majority. Some time after the marriage the plaintiff wife acquired an undergraduate degree. Plaintiff through most of the marriage has been employed in several different capacities. She plays the organ at church and at the ceremonies or celebrations such as weddings and parties where she is able to make some additional income. Some time in the mid 1980's the plaintiff decided to go into business with a partner and began a tailor shop in Woodbury known as The Village Tailor Shop. Subsequent to their opening, the partnership was dissolved and the plaintiff has since operated the business on her own. The court finds that this is a rather strange business operation. The plaintiff insists that she is so busy that she has to hire several other tailors to help her and used their first names except for one gentleman, a Mr. Santos, who is evidently handicapped. In Mr. Santos' case she delivered the work to be done to his home and picked it up at his home. She also had several women who worked for her not necessarily on a fulltime basis. One was a woman named Eleanor and another was a woman named Rosa. Also over the years there were several other people employed by the tailor shop for short periods of time.
When discussing how these employees handled the work, at first Mrs. Krulak indicated that they were paid for each job individually and that their earnings were at the cost of whatever CT Page 9567 she charged for the work to be done. In other words, if a person brought in a tailoring job for five or ten dollars, whatever it was, the employee got the whole thing and Mrs. Krulak retained nothing for her overhead or her profit. Yet, she was busy enough to employ all these people and also to farm out the work of Mr. Santos. Later in her testimony she changed her story to indicate that as a matter of fact Eleanor was paid $10.00 an hour and Rosa was paid $8.00 an hour and that their salaries had nothing to do with the jobs that they were doing for her.
Since Mrs. Krulak was open from the hours of ten to four each day, or six hours a day, and spent the rest of the time engaged in her sewing activities in the tailor shop, it was strange that last year she only reported a total net profit or income of $1800 for the year. When one considers the number of employees that she had and that she worked pretty much fulltime at this job, it is strange that she reported such a small income. This would indicate that she is either not a very credible person or that she is one of the worse business people the court has encountered.
To further show why the court did not find Mrs. Krulak to be a credible person, she drives a 1993 Cadillac on which she is paying approximately $128.00 a week, according to her financial affidavit. Also Mrs. Krulak has a good friend named Felicia. Before we get into this relationship the court would like to indicate that in its youth the court spent many an hour reading the stories of Mr. Aesop, the Grimm Brothers, and Mother Goose, and all of these people spoke about fairy godmothers. In spite of the extensive reading the court, even in its youth, found it difficult to believe in fairy godmothers. Mrs. Krulak tried to indicate to the court that she has a fairy godmother and it's Felicia. Mrs. Krulak enjoys gambling and has made several trips to Atlantic City and Las Vegas, at no cost to herself but because this Felicia friend paid all the expenses. Also she has taken several cruises in the last several years and the understanding of the court is that most cruise ships also carry aboard them a large gambling facility. Again, all of these trips were paid for by Felicia, plus there were several trips to Europe again at no or little cost to Mrs. Krulak. After all her testimony relative to these cruises and gambling junkets, the court still finds it difficult to believe in fairy godmothers.
Just one small aside. In Mrs. Krulak's tailor shop on the wall, where the public drops off and picks up its tailoring jobs, CT Page 9568 there's a big sign that says "Cash Preferred". This leads one to wonder why it is necessary to put up such a sign except that one knows that cash is much more difficult to trace than checks. Also there was an allegation that tickets issued to customers were often reused when the customers picked up their work and the customers brought work in to be done. It should also be noted that the plaintiff claims to have several physical disabilities and at one time was receiving social security disability payments and that after she opened her tailor shop, she forfeited approximately $300 per week in said payments in order to operate the tailor shop. It doesn't seem logical that a person would give up $15,000 a year for the privilege of operating a shop with a net return of $1800 to $2000 per year. Further, in making her application for her 1993 Cadillac, her application indicated a monthly income from the business of approximately $5000. All in all there is a lot of reason not to find the plaintiff to be a very credible witness. The court would also like to point out that the parties' son attended Taft, a private school, and Yale University and that the parents paid most of the money needed for his education. Further, the daughter attended Simmons College and Harvard and again the parents paid most of the expenses. Considering the husband's income as a professor at Western Connecticut State University, this was quite a financial feat to be accomplished without any help from Mrs. Krulak.
Further, at the time the defendant retired from his teaching position in June of 1992, he received a lump sum payment of almost $12,000 representing an early retirement benefit and also a sick leave payment in four equal payments for a total of approximately $18,000 or a grand total of almost $30,000. All of this money was turned over by the defendant to the plaintiff and now, three years later, there is no record of any of this money being available to the family estate. There is some stock of approximately between $12,000 and $13,000 in the wife's name, which was accumulated during the course of the marriage. The wife has a one-third interest in her mother's estate which currently totals approximately $77,000. However, the State of Connecticut has a lien against the estate for public assistance in an amount of approximately $200,000, leaving a negative balance in her mother's estate. The defendant has a 1986 Subaru station wagon which was not operating and for which he became obligated to put in a new engine to the extent of $2,000 and he had to borrow the money to accomplish that.
As for the defendant, he is a person with his own problems CT Page 9569 and idiosyncracies. At one time he did suffer a bout of depression but seems to have recovered from that. He is a compulsive buyer and spender. The plaintiff entered into evidence exhibits which are photographs taken within the house. The plaintiff would send the defendant out to make some grocery purchases and when he arrived at the store he spent money rather recklessly, at one time coming home with 50 cans of tuna fish and to the best recollection of the court, he once brought home something like 20 boxes of cereal at one time.
The parties also have one grandchild but the defendant, every time he went to Caldors or Bradlees or one of the stores carrying toys, would bring home bags of toys for the child. The parties' daughter has asked them on a number of occasions not to bring home toys of an aggressive nature, such as guns and bows and arrows, but he continues to bring home toys of that nature.
Also, the defendant is described as having a rather violent temper and when he loses his temper he engages in some profane language even in front of his grandchild. He has never been physically abusive to the wife or the children, although on one account he did strike one of the parties. The exhibits proffered during the case showed a house so cluttered with bags of groceries and toys that there was very little room to maneuver in the living room, the bedroom, the kitchen or in any of the other rooms in the house. This was an example of the defendant's obsessive purchasing of food and toys. It might also reflect to some extent that the plaintiff's housekeeping was not that good. The house was not very well maintained but at best moderately maintained. This is one of the reasons that its current value is as low as it is.
This case leaves the court in somewhat of a quandary because the assets listed are rather minimal and the only real income shown by the defendant is primarily from his pension and social security. Ordinarily the court wouldn't have any problem awarding the plaintiff what should be her interest in the pension income because it was earned during the course of the marriage and is a marital asset. However, the court has a problem in that it has no true knowledge as to the income of the plaintiff. This is because the court is convinced she has not shown a true income from her business. However, after 31 years of marriage, it would seem that she would be entitled to something, especially in light of the defendant's abusive nature, although mostly verbal. CT Page 9570
The first major item the parties own is the house. The court will order the home be placed on the market for sale and that the proceeds from the sale of the marital home be split evenly between the parties. The proceeds are the net proceeds after sale commissions and legal fees and payment of the first mortgage.
The next matter is the car purchased in 1993, which though the plaintiff has it listed at $15,000 on her financial affidavit, the evidence was that the car is worth $21,000 or more. This was based upon the testimony of the manager from Wes Cadillac in Waterbury where the car was purchased. This would actually leave the plaintiff with an equity in the car of about $9500. The defendant's car has a negative value right now since he owes $2000 to the party from whom he borrowed the money to put in the new motor. It is a 1986 Subaru with very little value. The trade-off on the difference in the equities will be that the defendant will be entitled to keep his life insurance policies with no interest to be given to the plaintiff wife.
The next item is personal property which is currently on the marital premises. The court will order the property be split equally between the parties and if there is some discrepancy in the values or the desires of the parties in what goes to whom, the only thing the court can say is that they will have to return for the division to be made at some future date, if that problem does occur. The defendant will keep all of his musical instruments since that is his profession and they were purchased for his personal use.
There is also a discrepancy in the bank accounts of approximately $900 but the defendant does have a cash flow which means he should be able to survive with no real problems, whereas we don't know what the plaintiff's cash flow truly is, though we suspect it is much, much higher than shown on the financial affidavits. There is also $12,000 worth of stock and the court would order that the stock either be sold and the proceeds distributed to the parties or that the plaintiff sign over one-half of all the shares outstanding to the defendant.
The defendant does have a Blue Cross/Blue Shield health policy for the period set forth by COBRA and she will have to pay the additional premium necessary to continue her as a beneficiary under said policy.
Since there was no value placed on the pension of the CT Page 9571 defendant, the court will not give to the plaintiff a percentage of the pension as such but will instead order that alimony be paid to the wife in the amount of $150 per week until the wife attains the age of 65. This alimony will be modifiable as to term and amount. The defendant can come into court for modification if he can prove the true income of the plaintiff. For the record the court would like to indicate that all the factors set forth in the statute relative to distribution of the estate have been taken into consideration for purposes of these dispositions.
Accordingly the court will enter a decree dissolving the marriage and orders will be ordered based upon the findings of the court as set forth in this memorandum.
M. MORGAN KLINE State Trial Referee